[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a quiet title action determining the respective rights of the plaintiff Jewett City Trust Company and the defendant Joseph Marino, if any, in and to certain real property known as 3 Reed Avenue, Waterford, Connecticut.
I. Procedural History
This lawsuit first came to this court by writ, summons and complaint dated June 25, 1993, filed July 1, 1993 and returnable July 13, 1993.
The complaint recited the plaintiff's claim of an equitable interest in certain real estate, notes that the plaintiff was engaged in a foreclosure of the premises and that the defendant claimed an interest in the real estate.
The prayer for relief requests:
 1. Judgment determining the rights of the parties in or to the land and settling the respective rights and interest in said title thereto.
2. Injunctive relief.
3. Such other relief as equity requires.
On July 9, 1993, the defendant appeared by counsel.
An answer and three special defenses were filed on August 24, 1993 by the defendant. The first special defense claimed a lack of standing to bring the action because the plaintiff was the mortgagee bank. The second special defense claimed res judicata. The third special defense claimed collateral estoppel.
On September 13, 1993, the defendant filed a counterclaim referring to a 1956 judgment in the Court of Common Pleas and CT Page 13573 claiming affirmation of a claimed injunction and an order prohibiting the plaintiff from constructing any buildings on the affected premises, costs, attorney's fees and such other relief as may be deemed equitable.
On September 28, 1993, the plaintiff filed an amended complaint claiming now to be the record owner of the subject premises by virtue of a foreclosure.
On October 1, 1993, the plaintiff filed an answer and special defenses to defendant's counterclaim.
On November 17, 1993, a request for leave to amend counterclaim was filed with proposed counterclaim by the defendant. This request was never acted on and on June 20, 1995, was withdrawn. The amended counterclaim which was withdrawn claimed in Count II a prescriptive easement and adverse possession.
The amended answer and special defenses to defendant's counterclaim dated December 15, 1993, and filed December 17, 1993, would, therefore, appear to be of no force and effect.
The defendant, on December 20, 1993, filed a reply to special defenses denying the special defenses which must relate to the August 24, 1993 answer and special defenses.
On July 11, 1994, new counsel appeared for the defendant. On April 10, 1995, different counsel appeared for the defendant, this being the same firm which had originally appeared.
On June 27, 1995, the plaintiff filed a reply to defendant's three special defenses. On September 20, 1995, during trial the court allowed the defendant to file an amended answer and special defenses which was in substantially the same form as the August 24, 1993 answer and special defenses, the earlier filed denials to apply.
II. Witnesses
The court makes the following findings of fact.
Thomas B. Wagner is the Planning Director for the Town of Waterford and has acted in that capacity for thirteen years. CT Page 13574
Mr. Wagner is the head of the Department and oversees matters of development and zoning in Waterford. Mr. Wagner holds a B.A. from Columbia University in Geography. Mr. Wagner is certified by the American Planners Society. Mr. Wagner is familiar with the subject real property having visited the same. The subject property has two zoning designations, V.R. 15 village residential and O.S. open spaces. Mr. Wagner is familiar with coastal area management requirements. The subject premises received a coastal site plan permit from the State of Connecticut subject to certain conditions including a conservation easement. Waterford side yard or set back requirements mandate twelve feet. The outstanding permit would not allow any activity on the so-called "spit of land."
Mr. Wagner testified, and the court finds that the February, 1949 subdivision was never completed and no permits incident thereto were ever issued. The 1949 subdivision was abandoned.
From the deposition of Joseph Marino taken on June 21, 1994, and read into the record at trial, the court makes the following findings.
Joseph Marino is a resident of 6 Reed Avenue, Waterford, Connecticut, and at the time of his deposition was 89 years old. Mr. Marino has resided at this address for many years. Mr. Marino purchased the subject premises with his late spouse in 1951. Mr. Marino inquired of his grantor, Max Beit (Beit), after the closing "when am I going to get a deed for the right-of-way." (Page 10 of the Deposition.) Mr. Marino testified in his deposition that there was a "verbal agreement" by his grantor to give him a right of way over Beit Street so-called. (Page 11 of the Deposition.) Mr. Marino testified in his deposition that "half of the land area has disappeared." "The water has overrun the land." Mr. Marino built a garage on his property in either 1951 or 1952. (Page 22 of the Deposition.) Mr. Marino never acquired any additional land from his grantor, Beit, after the 1951 closing. (Page 23 of the Deposition.) Mr. Marino testified that after the Town turned Beit down regarding certain building permits affecting the subject premises, Beit "told me that I could always use the parking lot as long as I'm living." (Page 23 of the Deposition.) Mr. Marino testified CT Page 13575 that Beit Street, so-called, was never built by his grantor, Max Beit, and that no lots were ever sold to his knowledge concerning the 1949 seventy-four lot subdivision. Mr. Marino testified that he made occasional use of Beit Street, so-called, for his car and boat. (Page 29 of the Deposition.) Mr. Marino testified that "I didn't know whether he meant that he was going to give me a right-of-way through there." (Page 36 of the Deposition.) Mr. Marino testified regarding the November 1956 injunction, "Oh, I didn't have to go to court if I remember right. We had some other business and I called McGarry, I think it was, and he took care of everything." Mr. Marino testified that his neighbors did not want anything built on the subject parcel. (Page 40 of the Deposition.) Mr. Marino testified that neighbors are helping him out with cash in this litigation. (Page 41 of the Deposition.) Mr. Marino testified in response to his own counsel at the deposition, "Did you have to go to court and get a permanent injunction against Max Beit?" (Answer, p. 43 of the Deposition.) Marino's answer, "No, I didn't have to because it was all done so fast." Again, on page 44 of the Deposition:
 Question: And do you know if you had to go to court and have a judge hear this?
Answer: No.
Question: You don't know or you didn't go?
Answer: No. He knew the area.
And again, on page 45 of the Deposition, "I didn't go to court."
Clinton S. Brown, II is a vice president of Deceasare and Bentley and a civil engineer of thirteen years standing. Mr. Brown has been a project engineer, staff manager, is familiar with regulatory matters, has been involved with subdivisions and resubdivisions of property. Mr. Brown is familiar with coastal problems, tidal wetlands, etc. Mr. Brown interprets rules and regulations and advises clients accordingly. Mr. Brown was Town Planner in Waterford for four years, a post now held by the witness Mr. Wagner. Mr. Brown has also been the Assistant Town Planner in Groton, has been employed by Electric Boat, holds a B.A. in Science from Northeastern CT Page 13576 University and is a member of the American Planning Association. Mr. Brown holds an engineering license in Connecticut. Mr. Brown visited the subject premises on several occasions. Mr. Brown testified regarding boat launching facilities and their requirements, turning radii, etc. Mr. Brown testified he would not recommend approval of what was depicted on the 1949 subdivision map if the matter was presented for consideration today. Mr. Brown testified that Marino could have access for a boat and trailer over his (Marino's) own premises without relying on the so-called Beit Street area.
Michael J. Scanlon is a registered land surveyor with Deceasare and Bentley and has been such for nine and one-half years. He is a vice president and part owner of the firm. Mr. Scanlon does title searches in various land records. Mr. Scanlon is licensed in Colorado, Connecticut and Rhode Island. Mr. Scanlon has done many surveys. According to Mr. Scanlon, Beit Street, so-called, is a paper street. Mr. Scanlon searched the land records in Waterford and found no record or notice of the 1956 injunction either temporary or permanent on said land records. Mr. Scanlon could not and did not find the merestones referred to in Marino's deed incident to the survey work or title search which he performed. Mr. Scanlon acknowledged that there was no wording in Marino's deed such as together with the right . . . etc. Scanlon acknowledged that Beit Street is "private land."
Randy Kirsch is an attorney at law and represented Ron Lyman in the purchase by Lyman of the subject parcel from Lombardi. This closing was done on September 12 or September 13, 1990 by mail. Incident to representing Lyman, Attorney Kirsch did a title search of the subject premises. No notice or record of the 1956 injunction by Parmelee, J. was found on the land records.
Attorney Kirsch represented Lyman. He did not represent the mortgage bank, Jewett City Trust. In due course after the closing, a title certificate was sent to the bank by attorney Kirsch. An exception was noted in the title certificate regarding the injunction, however, this was post recording. Attorney Kirsch was not paid or compensated in any way by Jewett City Trust. Attorney Kirsch has been in practice since 1979 and has handled hundreds of closings. Attorney Kirsch never told the Jewett City Trust prior to the mortgage closing CT Page 13577 or recording of the mortgage documents about the injunctions of 1956.
Mr. Leonard Stavrou is the President and C.E.O. of Jewett City Bank and Trust and has held this position since 1990. Mr. Stavrou is responsible for the general management of the bank. He is familiar with the Lyman mortgage. The loan to Lyman was approved on August 22, 1990. The property had been appraised by Miner and Silverstein, Inc., Co. appraisers. Stavrou contacted Attorney Kirsch after receiving the title certificate and expressed his concern regarding the exception taken concerning the 1956 injunction. The average annual number of mortgage loans made by Jewett City Bank is between 80 and 100. Jewett City Bank is a relatively small bank.
Marra Giuliano is a niece of Joseph Marino. Ms. Giuliano is conservatrix of the estate of Joseph Marino. Ms. Giuliano is not conservatrix of the person of Joseph Marino. No probate certificate establishing Ms. Giuliano's appointment was introduced as an exhibit in the proceedings. Mr. Marino in his earlier years had been a carpenter. Mr. Marino had been in the rental business and on acquiring the subject premises made the residence into three separate units. The third floor was rented seasonally. No weekly room rentals have occurred in twenty years. Over the years Mr. Marino has owned boats and motor vehicles. Marra Giuliano has never lived in Mr. Marino's home but has visited with him over the years.
Donald Gerwick is a licensed civil engineer and land surveyor engaged in private practice since 1984. Mr. Gerwick holds a B.A. in civil engineering from the University of Connecticut. Mr. Gerwick is familiar with the subject premises and was employed by the plaintiff bank to do a coastal site survey of the subject premises. Mr. Gerwick testified as to required turning radii for a boat and trailer attached to a motor vehicle as concerns a boat and trailer parked in front of Marino's garage.
In defendant's Exhibit 3, referring to the February, 1949 subdivision map (Plaintiff's Exhibit 4), which exhibit is the minutes of the Planning Commission of Waterford as concerns the Commission's approval of the plan are the words, ". . . . it be approved subject to submitting a letter of acceptance of bulkhead from Army Engineers and build roads subject to CT Page 13578 Planning Commission regulations." No acceptance from the Corps of Engineers was granted and no roads were ever built.
III. The court makes the following findings of facts from the exhibits.
As to the title of the plaintiff Jewett City Trust Company. Title to the subject premises known as 3 Reed Avenue, Waterford, stands in the name of Jewett City Trust Company pursuant to quit claim deed dated December 17, 1993, and recorded January 14, 1994 in the Waterford Land Records, Vol 428 at p. 88. The quit claim deed was executed after the bank had acquired title to the subject premises pursuant to a foreclosure action entitled The Jewett City Trust Company v.Ronald E. Lyman, Linda Lyman, et al, CV92-0102215S. (See Plaintiff's Exhibit 1I and 1H.)
The mortgage foreclosed was an open end mortgage dated September 14, 1990, from Ronald E. Lyman to the Jewett City Trust Company in the amount of $300,000.00, Waterford Land Records, Vol. 381 at p. 108-113. (See Defendant's Exhibit 32.)
Ronald E. Lyman acquired title to the subject premises by a warranty deed from Gwen Lombardi, Waterford Land Records, Vol. 381 at p. 101. (See Plaintiff's Exhibit 1F.) Ronald Lyman quit claimed his interest in the subject premises to Linda Lyman on November 21, 1990, Waterford Land Records, Vol. 383 at p. 278. (See Plaintiff's Exhibit 1G.)
Gwen Lombardi acquired her title by warranty deed from Eleanor M. Sudol dated September 11, 1990, Waterford Land Records, Vol. 381 at p. 26. Sudol's title goes back to quit claim deed Joseph T. Sudol to Eleanor M. Sudol dated October 24, 1984, Waterford Land Records, Vol. 287 at p. 261, and in turn to quit claim deed of John A. Sudol to Joseph T. Sudol dated September 27, 1984, Waterford Land Records, Vol. 287 at p. 259. John A. Sudol and Joseph T. Sudol acquired title to the subject parcel by warranty deed of Max Beit and Ethel M. Beit dated October 23, 1958, Waterford Land Records, Vol. 122 at p. 119.
All of these deeds, including Lyman's deed and the mortgage deed, contained the following words:
"Subject to such rights-of-way as may exist over CT Page 13579 the southerly end of Beit Street in favor of abutting land owners."
None of these deeds contained any express language referring to any rights-of-way or easement. None of these deeds referred to any specific instrument or the volume and page of any document on the land records referring to or describing any right-of-way or grant of easement. None of the aforementioned deeds contained wording such as "together with the right. . . ."
IV. The court makes the following findings of fact from theexhibits as to the title of the defendant Joseph Marino.
Title to the premises known as 6 Reed Avenue, Waterford, stands in the name of Joseph Marino pursuant to a warranty deed from Max Beit and Ethel Beit to Mary J. Marino and Joseph Marino dated June 7, 1951, Waterford Land Records, Vol 89 at p. 164. (Plaintiff's Exhibit 2B.) (See also, New London Probate Court Tax Certificate for land records concerning the late Mary J. Marino who expired on October 3, 1982. (Plaintiff's Exhibit 2C). The description of the real estate conveyed to Marino is set forth herein.
 Commencing at the southeast corner of the tract conveyed at its intersection with land now or formerly of Gertrude Learned; thence westerly along said Learned land one hundred and twenty-nine (129') feet, more or less, to the face of a sea wall at the waters of Long Island Sound; thence run northeasterly with the sea wall and the same line produced along the bulkhead a total distance of about two hundred and twelve (212') feet to a corner marked by a row of spikes in the top of the said bulkhead; thence run easterly at right angles with said last line sixty two and five tenths (62.5' feet to a merestone set in the westerly line of Beit Street as shown on a plan entitled "Highland Park Realty Development Property at Pleasure Beach in the Town of Waterford, Conn., belonging to Highland Realty Company, March 1948" drawn by Ernest C. Daboll, Scale 1" equals 60', which map is on file in the Town Clerk's Office in the Town of Waterford; thence running in a southerly direction along the west line of said CT Page 13580 Beit Street ninety two (92) feet to a merestone set in the north line of Reed Avenue; thence westerly along the north line of said Avenue seventeen and eight tenths (17.8') feet to a brass pipe bound; thence southerly across the end of Reed Avenue thirty (30') feet to a merestone at the northwest corner of other land of Learned before mentioned, and thence southerly along said Learned land fifty nine and nine tenths (59.9') feet to the merestone at point of beginning.
 Together with personal property now located in the dwelling on said property consisting of miscellaneous furniture and furnishings.
 Together with all the right, title and interest which these Grantors may have in and to all the land adjoining the face of the sea wall and the bulkhead between the easterly boundary of the above tract and the waters of Long Island Sound.
Marino's deed does not disclose the granting of any right-of-way or easement in and to Beit Street, so-called. The deed merely refers to the property being bounded by Beit Street.
V. As to the other exhibits the court finds
Defendant's Exhibit 28, the letter from the plaintiff bank to Ronald Lyman setting forth the loan approval, indicates under special condition no. 3 that the loan documents were to be reviewed by Attorney Richard Duda prior to closing, presumably this was the bank's counsel, inasmuch as a copy of the letter was sent to Attorney Richard Kirsch, Lyman's attorney. This exhibit tends to support Kirsch's testimony that he represented Lyman only. No testimony was offered as to any review by Attorney Duda, and Duda did not testify and was not called by the defendant.
Defendant's Exhibit 35 is an appraisal done by Miner and Silverstein dated July 9, 1990, directed to Ronald E. Lyman. A portion of the appraisal is set forth herein.
 The appraised property consists of a 14.5+/- acre vacant waterfront site. The site has CT Page 13581 approximately .50+/- of buildable land; the remaining acreage consists of a peninsular with a beach area along both sides. This peninsular is not buildable and is bordered to the north by Jordan Cove and to the south by the Long Island Sound and has a total of approximately 8,400 lineal feet of water frontage. The peninsular also contains good sandy beaches and per the client could support the construction of a dock on either side provided that it would be used only by the owner of the lot. The buildable portion of the site also has deep water frontage and could accommodate a dock. This area of the site will require some filling but the cost will not greatly affect the value due to the water access and view from the site. The entire property is located in the V8 flood hazard zone on map 090207 0015C a copy of which has been attached. The property is currently assessed for $127,530.00 with an annual tax burden of $1,333.96. The property is located in two zones, the peninsular is located in the O.S. Open Space zone and the buildable area is located in the VR15 Residential zone.
 Based on our analysis of the sales data, it is our opinion that the contributory value of the .50+/- acre buildable area was $425,000 and the contributory value of the 14+/- acre non-buildable beach front area was $175,000 and the total market value of the entire parcel, as-is, constructed on the site, as of July 6, 1990, was $600,000.
Defendant's Exhibit 33, the Certificate of Title issued by the Attorney Kirsch to the plaintiff bank contains the following reference.
 Item 8. Any rights-of-way as may exist over the southerly end of Beit Street in favor of abutting land owners.
 Item 11. Unrecorded rights to pass and repass over the property in favor of Mary J. Marino and Joseph Marino as set forth in a certain judgment dated November 16, 1956, as rendered by the Honorable Vine R. Parmalee, Court of Common Pleas, New London CT Page 13582 County, Docket No. 14404
Defendant's Exhibit 5, the memorandum of decision by the late Judge Parmelee, is set forth herein.
 NOVEMBER 13, 1956 MEMORANDUM OF DECISION Docket # 14404 - Marino vs. Beit
On June 7, 1951, the defendants, by warranty deed of that date, recorded in Waterford Land Records, Book 89, Page 164, conveyed title to a certain lot of land, with the buildings thereon standing, located in said Town of Waterford, County of New London and State of Connecticut, to the plaintiffs, bounded as follows:
 Commencing at the southeast corner of the tract conveyed at its intersection with land now or formerly of Gertrude Learned; thence westerly along said Learned land one hundred and twenty-nine (129') feet, more or less, to the face of a sea wall at the waters of Long Island Sound; thence run northeasterly with the sea wall and the same line produced along the bulkhead a total distance of about two hundred and twelve (212') feet to a corner marked by a row of spikes in the top of the said bulkhead; thence run easterly at right angles with said last line sixty two and five tenths (62.5' feet to a merestone set in the westerly line of Beit Street as shown on a plan entitled "Highland Park Realty Development Property at Pleasure Beach in the Town of Waterford, Conn., belonging to Highland Realty Company, March 1948" drawn by Ernest C. Daboll, Scale 1" equals 60', which map is on file in the Town Clerk's Office in the Town of Waterford; thence running in a southerly direction along the west line of said Beit Street ninety two (92) feet to a merestone set in the north line of Reed Avenue; thence westerly along the north line of said Avenue seventeen and eight tenths (17.8') feet to a brass pipe bound; thence southerly across the end of Reed Avenue thirty (30') feet to a merestone at the northwest corner of other land of Learned before mentioned, and thence southerly along said Learned land fifty nine and nine tenths (59.9') feet to the merestone CT Page 13583 at point of beginning.
 Together with personal property now located in the dwelling on said property consisting of miscellaneous furniture and furnishings.
 Together with all the right, title and interest which these Grantors may have in and to all the land adjoining the face of the sea wall and the bulkhead between the easterly boundary of the above tract and the waters of Long Island Sound.
The plaintiffs are still the owners and in possession of the premises described in paragraph 1 of this complaint.
Although the aforesaid deed given by the defendants to the plaintiffs describes said property as having a frontage of ninety-two (92) feet on Beit Street and as shown on a plan entitled "Highway Park Realty Development Property at Pleasure Beach in the Town of Waterford, Conn., belonging to Highland Realty Company, March, 1948" as on file in the office of the Town Clerk of said Waterford, the defendnats [defendants] have erected and are continuing to maintain a fence across the entire width of said Beit Street at its intersection with Reed Avenue.
Before plaintiffs purchased the property they demanded that a fence previously erected across Beit Street by defendants be moved to the north so that there would be access to Beit Street along the entire frontage. Defendants complied with this demand. In other words, plaintiffs made it clear that they were to have access to and from their property along the entire frontage on Beit Street. The fence as now located on Beit Street prevents access to and from that portion of plaintiffs' property along the Beit Street frontage.
It is well settled that "where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had to them, and then sells the lots, referring in his conveyances to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands." Whitton v. Clark, 112 Conn. 28, 32, 151 A. 305; LakeGarda v. D'Arche, 135 Conn. 449, 453. The test of the right to use property as a street is whether the street so shown is or may be of benefit under any situation reasonably to be CT Page 13584 anticipated. Lake Garda v. D'Arche, supra. Property with this much frontage adjoining a street or right of way may be put to a variety of uses beneficial to the owner. The deed from these defendants to these plaintiffs described the land conveyed as bounded upon this proposed street and defendants are now estopped to deny the existence of a street at least sufficient to entitle the plaintiffs to a right of way over the land referred to. Buckley v. Maxson, 120 Conn. 511.
The issues are found for the plaintiffs on the complaint and cross complaint. Judgement may enter ordering defendants to remove the fence or fences preventing plaintiffs' access to Beit Street from Reed Avenue and from their property bordering on said Beit Street and a permanent injunction restraining future interference with the rights of plaintiffs in said Beit Street. Compliance within two weeks. Parmelee, J.
The Law
Res Judicata — Collateral Estoppel — Law of the Case
Res Judicata
The doctrine of res judicata, or "claim preclusion," provides that a former judgment may serve as an absolute bar to a subsequent action involving claims which were actually made or which might have been made in the original cause of action. Connecticut Water Co. v. Beausoleil, 204 Conn. 38,43, 526 A.2d 1329 (1987); see Virgo v. Lyons, 209 Conn. 497,501-02, 551 A.2d 1243 (1988). "When a valid and final personal judgment is rendered in favor of the plaintiff: (1) the plaintiff cannot thereafter maintain an action on the original claim or any part thereof. . . ." See Orselet v.DeMatteo, 206 Conn. 542, 545, 539 A.2d 95 (1988). "Our rules of res judicata are based on the public policy that `a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate.'" (Citations omitted.)Duhaime v. American Reserve Life Insurance Co., 360, 363-64,511 A.2d 333 (1986); see also Orselet v. DeMatteo, 206 Conn. 542,539 A.2d 95 (1988).
The defense of res judicata must be specifically pleaded in accordance with Practice Book § 164. Anderson v. LatimerPoint Management Corp., 208 Conn. 256, 263, 545 A.2d 525
(1988); see Beccia v. Waterbury, 185 Conn. 445, 450, CT Page 13585441 A.2d 131 (1981). However, in appropriate circumstances the court may invoke res judicata sua sponte. See Tucker v. PaceInvestment Associates, 32 Conn. App. 384, 391, 629 A.2d 470
(1993). (The general rule [that res judicata must be specifically pleaded] yields, when, as here, the circumstances reveal that a remand would simply set judicial wheels unnecessarily spinning, only to remain at the same end of the road.) A disposition based on res judicata is properly accomplished through a motion for summary judgment, not a motion to dismiss. Zizka v. Water Pollution ControlAuthority, 195 Conn. 682, 686-87, 490 A.2d 509 (1985). It is well established that the party asserting the affirmative defense of res judicata bears the burden of establishing its applicability. Commissioner of Environmental Protection v.Conn. Bldg. Wrecking, 227 Conn. 175, 195, 629 A.2d 1116 1993).
The res judicata defense must be predicated on a final decision, a judgment on the merits. Hughes v. Bemer,206 Conn. 491, 494-95, 538 A.2d 703 (1988) (recognizing that the granting of a motion to strike and subsequent failure to plead over may result in a final decision on the merits sufficient to support a res judicata defense); Gagne v. Norton, 189 Conn. 29,31-32, 453 A.2d 1162 (1983); see also Southport ManorConvalescent Center, Inc. v. Foley, 216 Conn. 11, 578 A.2d 646
(1990) (reversing the Appellate Court's conclusion that the judgment of dismissal for failure to file a timely opposing memorandum amounted to a judgment on the merits that bars relitigation because of res judicata). "`Judgment based on the following reasons are not rendered on the merits: want of jurisdiction; pre-maturity; failure to prosecute; unavailable or inappropriate relief or remedy; lack of standing.'"Legassey v. Shulansky, 28 Conn. App. 653, 658, 611 A.2d 930
(1992), quoting 2 E. Stephenson, Connecticut Civil Procedure (2d Ed.) § 354d. "`For the purposes of res judicata, the effective date of a final judgment is the date of its rendition, without regard to the date of commencement of the action in which it is rendered or the action in which it is to be given effect.'" Jackson v. Aetna Life Ins. Co.,6 CSCR 712, 712 (July 13, 1991, Maloney, J.), quoting 1 Restatement (Second) Judgments § 14.
A judgement rendered on a default is an appropriate basis for the defense. Milgrim v. DeLuca, 195 Conn. 191, 196,487 A.2d 522 (1985); see Mac's Car City, Inc. v. American NationalBank, 40 Conn. Sup. 467, 469-70, 515 A.2d 382 (1986, Wagner, CT Page 13586 J.), aff'd on other grounds, 205 Conn. 255, 532 A.2d 1302
(1987). For a recent discussion of the preclusive effect of a default judgment, see Jackson v. R.G. Whipple, Inc.,225 Conn. 705, 717, 627 A.2d 374 (1993). A dismissal of a civil action for failure to prosecute with reasonable diligence pursuant to P.B. § 251, has no preclusive effect. "Such a dismissal does not preclude a litigant from commencing another action on the same claim" under the accidental failure of suit statute Morrelli v. Manpower, 29 Conn. App. 132, 137-38,612 A.2d 822 (1992).
A decision concerning an application to quash an administrative subpoena is a judgment on the merits; and hence subsequent applications may be barred by the doctrine of res judicata. Legassey v. Shulansky, supra, 28 Conn. App. 658. Similarly, the principles of res judicata also apply to arbitration proceedings, reflecting the confidence shared by the legislature and our courts that arbitrators have the competence to decide complex issues of law and fact. Genovesev. Gallo Wine Merchants, Inc., 226 Conn. 475, 478,628 A.2d 946 (1993).
A dismissal of criminal charges or a criminal judgment based on a plea of nolo contendre or plea of guilty have no preclusive effect in a subsequent civil action. Rawling v.New Haven, 206 Conn. 100, 111, 537 A.2d 439 (1988). "A summary process action . . . can have no res judicata effect in a subsequent action for damages between the same parties."Carnese v. Middleton, 27 Conn. A. 530, 535, 608 A.2d 700
(1992). It is the judgment of the trial court, if affirmed, which constitutes the final judgment, not the decision of the Supreme Court. Beccia v. Waterbury, 192 Conn. 127, 132,470 A.2d 1202 (1984) (Supreme Court decisions are not final judgments).
"Connecticut's res judicata rules are derived from the theory of merger and the transactional test set out in the Restatement (Second) of Judgments." Legassey v. Shulansky,
supra, 28 Conn. App. 656, citing Dunham v. Dunham, 221 Conn. 384,390-91 n. 10, 604 A.2d 347 (1992); Vakalis v. Kagan,18 Conn. App. 363, 557 A.2d 1285 (1989). Merger is the extinguishing of the plaintiff's original claims through the rendering of final judgment. Legassey v. Shulansky, supra. "When the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon CT Page 13587 the judgment are substituted for it. The plaintiff's original claim is said to be merged in the judgment." (Internal quotation marks omitted.) Id., quoting 1 Restatement (Second) Judgments § 518.
 We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action as to trigger operation of the doctrine of res judicata. . . . The claim that is extinguished by the judgment in the first action includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual group constitutes a `transaction,' and what groupings constitute a `series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.
Commissioner Environmental Protection v. Conn. Bldg. Wrecking,
supra, 227 Conn. 1989-90.
In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action. Id., 190.
"Even though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action." Duhaime v. American Reserve LifeIns. Co., supra, 200 Conn. 364-65.
"Original claim" has been defined by the Restatement in § 24(1): "[t]he claim [that is] extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." 1 Restatement (Second) Judgments § 24(1); see Duhaime v. AmericanReserve Life Ins. Co., supra, 200 Conn. 364; see also Vakalisv. Kagan, supra, 18 Conn. App. 366-67; Dunham v. Dunham,
supra, 221 Conn. 392 n. 10. CT Page 13588
"This test measures the preclusive effect of an earlier judgment, and will exclude not only claims which were asserted, but also those which could have been asserted."Duhaime v. American Reserve Life Ins. Co., supra, 200 Conn. 364; see Labieniec v. Nichols, 18 Conn. App. 117, 119,556 A.2d 635 (1989).
Res judicata applies to criminal as well as civil proceedings. McCarthy v. Warden, 213 Conn. 289, 294,567 A.2d 1187 (1989), cert. denied, 496 U.S. 939, 110 S.Ct. 124
(1983). Res judicata may operate to preclude relitigation by a criminal defendant as well as by the state. State v.Aillon, supra, 424. In applying the doctrine to a defendant's constitutional claim, the interest in achieving finality in criminal proceedings must be balanced against the interest in achieving finality in criminal proceedings must be balanced against the interest in assuring that no individual is deprived of his liberty in violation of his constitutional rights. Id., 425. Whether two claims in a criminal case are the same for the purposes of res judicata should be considered in a practical frame and viewed with an eye to all the circumstances of the proceedings. Id.; see State v. Paradise,213 Conn. 388, 393, 567 A.2d 1221 (1990).
The doctrine of res judicata may also apply to administrative agency decisions. See Carothers v.Capozziello, 215 Conn. 82, 94, 574 A.2d 1268 (1990).
 "As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when `the parties have had an adequate opportunity to litigate.'" A valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."
(Citations omitted. Id., 94. There are, however, several specific exceptions to the application of res judicata in administrative adjudications. New England RehabilitationHospital, Inc. v. CHHC, 226 Conn. 105, 130, 627 A.2d 1257
(1993).
Some administrative determinations are clearly CT Page 13589 without res judicata effect in any circumstances — a zoning board after hearing amends a regulation, a utilities commission prescribes a maximum rate, the [Civil Aeronautics Board] decides which of two airlines should provide a particular services, or [The National Labor Relations Board] refuses to issue a complaint on a particular charge. . . . A rate order is not res judicata. Every rate order may be superseded by another. . . . The main reason is that conditions change.
Id., 130-31.
In DeLaurentis v. New Haven, 220 Conn. 225, 597 A.2d 807
(1991), the Connecticut Supreme Court rejected defendants' claim, on appeal, that the federal court's dismissal of plaintiff's § 1983 suit barred the state court action arising out of the same events under the principle of res judicata. Noting that the federal district court did not reach the sufficiency of the complaint's independent state law claims, the Supreme Court in DeLaurentis stated:
 having already dismissed the federal claim, the court simply declined to exercise pendent jurisdiction over the state law claims that remained. "When state law claims are pleaded, and dismissed without reaching their substantive merits, if the dismissal is based on a discretionary refusal to decide them, it does not bar a subsequent suit on the same claims, either in the state court or in another suit in the federal court."
(Citations omitted.) Id., 240-41.
Collateral Estoppel
Collateral estoppel, or "issue preclusion," is the doctrine that bars relitigation, in a second action between the same parties brought upon a different claim, of issues already determined in the first action. Rawling v. New Haven,206 Conn. 100, 110, 537 A.2d 439 (1988); see also AetnaCasualty Surety Co. v. Jones, 220 Conn. 285, 296,596 A.2d 414 (1991); Virgo v. Lyons, 209 Conn. 497, 501-02,551 A.2d 1243 (1988). The related doctrines of res judicata and CT Page 13590 collateral estoppel protect the finality of judicial determinations, conserve the time of the court, and prevent wasteful relitigation. Gionfriddo v. Gartenhaus Cafe,15 Conn. App. 392, 401, 546 A.2d 284 (1988), aff'd on other grounds, 211 Conn. 67, 71, 557 A.2d 540 (1989); see State v.Ellis, 197 Conn. 436, 465-66, 497 A.2d 947 (1985). The doctrine of collateral estoppel applies to criminal as well as civil proceedings. State v. Fritz, 204 Conn. 156, 172,527 A.2d 1157 (1987).
"For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Citations omitted.)Aetna v. Casualty Surety Co. v. Jones, supra, 220 Conn. 296; see also 2 Restatement (Second) Judgments § 27; the issues sought to be litigated in the new proceedings must also be identical to those considered in the prior proceeding.Cochiere v. Board of Education, 227 Conn. 333, 345,630 A.2d 1027 (1993).
"An issue if `actually litigated' if it is properly raised in the pleadings, submitted for determination, and in fact determined." State v. Ball, 226 Conn. 265, 276,627 A.2d 892 (1993).
 Furthermore, there is a strong basis for the rationale behind the rule that an issue must be essential or [necessary] to the judgment before it can be barred by collateral estoppel. In Halpern v. Swartz, 426 F.2d 102, 105 (2d Cir. 1970), the court gave two reasons why an issue must be essential to the judgment before collateral estoppel applies: "First, the decision on an issue not essential to the prior judgment may not have been afforded the careful deliberation and analysis normally applied to essential issues, since a different disposition of the inessential issue would not affect the judgment. . . . Second, the decision on an inessential issue in the prior judgment was not subject to the important safeguard as to its correctness, to wit: a contested review on appeal." (Citation omitted.)
 Resolution Trust Corp. v. Hausmann, Superior Court, CT Page 13591 Judicial District of Danbury, Docket No. 306769 (May 13, 1993, Moraghan, J.).
"Collateral estoppel can be applied only to bar relitigation of facts that were formally put in issue and ultimately determined by a valid, final judgment." (Citation omitted.) Carnese v. Middleton, supra, 27 Conn. App. 542. "To establish whether collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." (Citations omitted. ) Id., 297.
The court in State v. Ellis pointed out in dicta that: "The revised Restatement defines `issues litigated' broadly enough to preclude bringing forth in a later proceeding new evidence or new legal theories, which might have been raised in the prior adjudication of that issue." State v. Ellis,
supra, 197 Conn. 464 n. 21, citing 1 Restatement (Second) Judgments § 27, comments c and e (1982). This recognition may indicate a trend away from the "actually litigated" requirement of collateral estoppel. See State v. Ellis,
supra, 464-65 n. 21, 22.
The principles of collateral estoppel always apply where both of the parties in the second action were present in the first action. Gionfriddo v. Gartenhaus Cafe, supra, 15 Conn. App. 402. Under the "mutuality doctrine," neither party may use a prior judgment as an estoppel against the other unless both parties were bound by the judgment. Id., 403.
Recently, in Aetna Casualty Surety Co. v. Jones, supra,220 Conn. 302, the Supreme Court abandoned the mutuality of parties rule as unsound. The court reasoned that "[t]o allow a party who has fully and fairly litigated an issue at a prior trial to avoid the force of a ruling against him simply because he later finds himself faced by a different opponent is inappropriate and unnecessary." Id.
Collateral estoppel may also invoke against a party to a prior adverse proceeding or against those in privity with that party. Id., 303; Weiss v. Statewide Grievance Committee,207 Conn. 802, 818, 540 A.2d 75 (1993).
While it is commonly recognized that privity is CT Page 13592 difficult to define, the concept exists `to ensure that the interests of the party against whom collateral estoppel is being asserted have been adequately represented because of his purported privity with a party at the initial proceeding.' A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity.
(Citations omitted.) Aetna Casualty surety Co. v. Jones,
supra 220 Conn. 304; see also Weiss v. Statewide GrievanceCommittee, supra, 818.
The collateral estoppel defense, like res judicata, depends on the existence of a valid final judgment on the merits. Telesco v. Telesco, 187 Conn. 715, 719, 447 A.2d 752
(1982); see Cory v. Avco-Lycoming Division, 163 Conn. 309,317, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116 (1973). There is a divergence of views among the states and commentators as to whether a prior judgment rendered by default can have a collateral estoppel effect in a subsequent action. Hansted v. Safeco Ins. Co. of America, 19 Conn. App. 515,518, 562 A.2d 1148 (1989); see Slattery v. Maykut,176 Conn. 147, 159 n. 8, 405 A.2d 76 (1978). The resolution of this question has not been decided by a Connecticut court, but the Ellis decision suggests that if faced with this precise issue, the court would hold that a default judgment would have collateral estoppel effect in a future suit. Hansted v.Safeco Ins. Co. of America, supra, 518-19 n. 2; see State v.Ellis, supra, 197 Conn. 464 n. 21.
Collateral estoppel does not apply where an action commenced in federal court was dismissed based upon a successful 12(b)(6) motion (motion to dismiss for failure to state a claim upon which relief can be granted, similar to Connecticut's motion to strike., "for no facts are either litigated or found, because the court in ruling upon such a motion is required to accept as true all facts pleaded in the complaint and to construe the complaint liberally."DeLaurentis v. New Haven, supra, 220 Conn. 240. The doctrine may apply to determinations of administrative agencies under certain circumstances. See Convalescent Center of Bloomfield,Inc. v. Dept. of Income Maintenance, 208 Conn. 187, 201,544 A.2d 604 (1988) (holding agency decision not accorded preclusive effect where judicial review unavailable). CT Page 13593 Collateral estoppel, like res judicata must be pleaded as a special defense. Carnese v. Middleton, supra, 27 Conn. App. 537. A party cannot utilize res judicata or collateral estoppel when it has committed fraud. Jackson v. Whipple,Inc., 225 Conn. 705, 709, 627 A.2d 374 (1993).
Law of the Case
"`Law of the case' is the controlling legal rule of decision, as established by a previous decision, between the same parties in the same case." 21 C.J.S. § 195, p. 330. The doctrine of the law of the case is a rule of practice and not a principle of substantive law. Id., 330-31.
The law of the case is a flexible principle which expresses the practice of judges generally to refuse to reopen what has been decided and is not a limitation on their power.Breen v. Phelps, 186 Conn. 86, 99, 439 A.2d 1066 (1982); seeRosenblit v. Danaher, 206 Conn. 125, 132, 537 A.2d 145 (1988); see also Daley v. Hartford, 215 Conn. 14, 29, 574 A.2d 194
(1990), cert. denied, 111 S.Ct. 513, 111 L.Ed.2d 525
(1991). New pleadings intended to raise again a question of law which has been already presented on the record and determined adversely to the pleader are not to be favored, but a determination so made is not necessarily to be treated as an infallible guide to the court in dealing with all matters subsequently arising in the cause. Breen v. Phelps, supra 99, quoting Wiggin v. Federal Stock grain Co., 77 Conn. 507,516, 59 A. 607 (1905). Where a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstances. Miller v. Kirschner, 225 Conn. 185, 191,621 A.2d 1326 (1993); Breen v. Phelps, supra, 186 Conn. 99; seeState v. Hoffler, 174 Conn. 452, 464-63, 389 A.2d 1257 (1978); see also State v. Mariano, 152 Conn. 85, 91, 203 A.2d 305
(1964), cert. denied, 308 U.S. 943 (1965).
A judge should hesitate to change his own ruling in a case and should be even more reluctant to overrule a ruling of another judge. Breen v. Phelps, supra, 186 Conn. 99; seeRatner v. Willametz, 9 Conn. App. 565, 578, 520 A.2d 621
(1987). CT Page 13594
 We observed in Breen that the law of the case doctrine is not one of unbending rigor when we said: "A judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he had himself made the original decision."
Miller v. Kirschner, supra, 225 Conn. 191-92.
A trial court may apply its own judgment regarding an interlocutory ruling if the case comes before it regularly and it becomes convinced that the view of the law previously applied by a coordinate predecessor was clearly erroneous and would work a manifest injustice if followed. Carothers v.Cappozziello, supra 215 Conn. 107; see Breen v. Phelps, supra,186 Conn. 100.
Law of the case differs from res judicata in that the former applies to interlocutory orders, whereas the latter applies to a judgment on the merits. See Ratner v. Willametz,
supra, 9 Conn. App. 573.
DISCUSSION
This case is a quiet title action. The plaintiff's complaint states that the defendant "claims estate or interest in the land or parts thereof which are adverse to the title and interest of the plaintiff. The plaintiff's complaint prays for, inter alia, "a judgment determining the rights of the parties in or to the land and settling the respective rights and interests in said title thereto."
The defendant has pled three special defenses. The first alleges that the plaintiff lacks standing because it is the mortgagee. However, this claim is now moot since defendant has filed a certificate of foreclosure which is marked as plaintiff's Exhibit 1H. The defendant's second special defense allege that the 1956 judgment of Judge Vine Parmelee acts as res judicata. The defendant's third special defense alleges that plaintiff is collaterally estopped from quieting title because of the 1956 judgment.
This litigation does not involve: CT Page 13595
 1. A right-of-way by deed, because the deeds in plaintiff's and defendant's chain of title contain no explicit grant of a right-of-way, and it has not been pled;
 2. A right-of-way by prescription because it has not been pled;
 3. Rights by adverse possession, because defendant has withdrawn this claim;
 4. A right-of-way by necessity, because it has not been pled; and,
 5. A right-of-way by implication, because it has not been pled.[1]
The plaintiff's chain of title is devoid of any express land record reference to a right-of-way in favor of the defendant. The original common grantor, Max Beit, did not state in the Marino deed that he was conveying the property "together with a right-of-way in favor of Joseph Marino," or words to that effect. Additionally, Mr. Beit did not convey his property to Sudol in 1958 with a specific reference that his property was subject to a right-of-way in favor of Joseph Marino. The fact that the plaintiff's deed refers to "such rights-of-way as may exist," is insufficient to create a specific right-of-way in favor of the defendant. See Conn. Gen. Stat. § 47-33d and § 47-33e. Such vague references in deeds cannot be construed as granting a specific right-of-way to the defendant. Id.
The plaintiff was the only party who produced an A-2 survey, prepared in the field. Both the A-2 survey and both parties' chains of title are devoid of a reference to any specific right-of-way in favor of Joseph Marino.
Did the Jewett City Trust Company Have Actual orConstructive Notice of the 1956 Judgment at the Time ofClosing?
Attorney Randy Kirsch testified that he represented Ronald Lyman in both the closing in which Mr. Lyman purchased the property from Lombardi and in the subsequent transaction CT Page 13596 in which Mr. Lyman gave a mortgage to plaintiff. Attorney Kirsch testified that he did not represent plaintiff at any time. The parties stipulated at trial that Attorney Thomas J. Londregan represented Lombardi in the September, 1990 sale of 3 Reed Avenue, but that he did not represent plaintiff until December, 1992.
Attorney Kirsch further testified that he had no oral or written agreement with plaintiff, and received no fee from plaintiff. He also testified that his title search in 1990 did not reveal the 1956 judgment. Defendant's land surveyor, Michael Scanlon, testified that he did not find the 1956 judgment on the land records when he searched the title in 1995. Therefore, the evidence has established that the 1956 judgment was never recorded.
Leonard Stavrou, President and CEO of Jewett City Trust Company testified that he had no knowledge of the 1956 judgment until five (5) days after the closing. (See Defendant's Exhibit 33.) Mr. Stavrou testified that the appraisal report marked as Defendant's Exhibit 35, made no reference to the 1956 judgment.
Mr. Stavrou further testified that he was extremely "surprised" when he received the certificate of title from Attorney Kirsch.
Further evidence of Mr. Stavrou's surprise comes from the fact that he called Attorney Kirsch immediately, the day he received the certificate of title.
Since neither plaintiff nor its agents had actual knowledge of the 1956 judgment should it be enforced against them? Attorney Kirsch's knowledge cannot be imputed to the plaintiff because he was not their agent. Although Mr. Stavrou was apparently under the impression that Attorney Kirsch represented the plaintiff, Attorney Kirsch clearly knew that he did not represent the plaintiff. It is a fundamental precept of contract law that no contract can be formed without a meeting of the minds of the parties. Bridgeport PipeEngineering Co. v. DeMatteo Construction Co., 159 Conn. 242,246 (1970); Steinberg v. Reding, 24 Conn. App. 212 (1991); see 1 Williston, Contracts (3d Ed. Jaeger) § 51. Because there was no meeting of the minds, there was no contract. CT Page 13597
Can the unrecorded judgment be enforceable against the plaintiff? The Connecticut Supreme Court has held that:
 It is the policy of our law that all interests in land shall, as far as practicable, appear on the land records so that they may be easily and accurately traced, and implied grants of land or of easements or of any interest in the land are allowable here, when allowed at all, to a very much more limited degree than in other states. The maintenance of the effectiveness of our registry system requires that one who relies in good faith on title apparently complete shall be protected against any claimed interests not of record, of which he had no notice.
Hawley v. McCabe, 117 Conn. 558, 564 (1933); see also, AshleyRealty Co. v. Metropolitan Dist., 13 Conn. Sup. 91, 95 (Com. Pl. 1944); modified in part (unrelated) 132 Conn. 551 (1944).
The unrecorded 1956 judgment should not be enforced against plaintiff because neither it nor its agents had actual or constructive knowledge of the judgment.
Res Judicata and Collateral Estoppel.
It is a fundamental principle of res judicata and collateral estoppel that there must be the same parties and the same issues previously litigated. Laurel, Inc. v.Commissioner of Transportation, 180 Conn. 11, 22 (1980);Lechner v. Holmberg, 165 Conn. 152, 156 (1953). The Jewett City Trust Company was not a party to the 1956 action. The 1956 judgment merely required that Mr. Beit remove a fence. The nature, scope and breadth of any easement was never determined by that court's decision.
The 1956 Judgment Which Was Based on the 1949 SubdivisionMap is No Longer Valid Because: (1) The Law Has Changed(Connecticut General Statutes § 8-26c Was Enacted) and, (2) TheFacts Have Changed.
Changes in the law and facts since 1949 invalidate the subdivision map which was approved by the Town of Waterford in 1949. CT Page 13598
The law has changed since 1949 in two respects. First, Conn. Gen. Stat. § 8-26c invalidates subdivisions approved prior to October 1, 1989, if the subdivision is not built within seven years of approval. Second, state and federal laws preclude development of a subdivision on a barrier beach. See Conn. Gen. Stat. § 22a-90, et seq. Messrs. Wagner, Brown, Scanlon and Gerwick testified that the only permissible location to build a home is as depicted in plaintiff's Exhibit 5 (i.e. .62 acres of the approximately 14 acre parcel).
Connecticut General Statutes § 8-26c(d) provides:
 Notwithstanding the provision of this section to the contrary, any subdivision approval made under this section on or before October 1, 1989, shall expire not more than seven years from the date of such approval and the commission may grant one or more extensions of time to complete all or part of the work in connection with such subdivision, provided the time for all extensions under this subsection shall not exceed ten years from the date the subdivision was approved.
Through this statute, the legislature has expressed a clear intent to invalidate all subdivisions which have not been developed within seven years from the date the town issues approval. Moreover, the clear language of this statute demonstrates that the legislature limited the life of any subdivision to ten years. Furthermore, the clear language of the statute, in referring to subdivisions approved on or before October 1, 1989, demonstrates that the legislature intended the statute to have retroactive effect.
In addition to the changes in law since 1949, there have been changes in the facts with regard to the 1949 subdivision. These changes occurred both after 1949, when the subdivision was approved, and after 1956, when Judge Parmelee rendered his decision.
The facts which have changed are as follows: The developer, Beit, never complied with the conditions of approval as noted on Plaintiff's Exhibit 12; developer never completed any subdivision improvements; no road known as Beit Street was ever developed, built or accepted by the Town of Waterford; no approval from the federal or state agencies, as CT Page 13599 is presently required, have been obtained for development of the spit; portions of the spit have been eroded by nature; none of the numbered lots, which are numbered 1-74, have been sold.
The defendant contends that he bought a "lot" in the subdivision. Defendant bought a portion, 19 or 20 feet according to defendant (see Defendant's Deposition, p. 22), of a "reserved area." The portion is not even large enough to be a building lot.[2] A reserved area is a term of art. Today's Waterford Zoning Regulations clearly distinguish between reserved areas and building lots. Section 1.23 of the Waterford Zoning Regulations defines a reserved area as "a section of land reserved for future street connections, public facilities, foot paths, access ways or open space." The regulations do not state that a reserved area is an area for future building lots. Defendant purchased a portion of a reserved area. By looking at the 1949 subdivision map it is clear from the shapes of the reserved areas that these were not intended for building, but rather were probably intended as access ways to the beach or open space for shrubs, flowers, etc.
To the extent that defendant's deed refers to the 1949 subdivision map, it refers to an invalid map. Defendant can have no rights in an invalid map. The so-called "Beit Street" only existed as a paper street as long as the map on which it was written was valid. Since the map is no longer valid, Beit Street cannot even be considered to be a paper street. The reference in defendant's deed to this non-existing street and invalid subdivision should only be used to demarcate his property boundary, just as the reference in defendant's deed of "to the waters of Long Island Sound" demarcate his property boundary. See Meshberg v. Bridgeport City Trust Co.,1 Conn. App. 10-14 at p. 13 (1983). "The deed of title to the plaintiff recognized Hudson Street as a boundary line and not part of her premises."
Due to the changes in the law and facts since 1956, when Judge Parmelee rendered his decision, his decision is no longer controlling. Defendant's deposition states that in 1956 Beit still expected to complete the subdivision. (See Defendant's Deposition, pp. 48-49. The changes in law and facts demonstrate that it would be impossible to develop the property, other than as depicted in plaintiff's Exhibit 5. CT Page 13600 Thus, Judge Parmelee's decision is predicated on the existence of a valid subdivision and on the premise that the subdivision would be completed. Since neither of these is the case today, the decision is not controlling. In addition, his decision only dealt with an injunction about a fence and did not determine the extent, scope and breadth of any rights of the defendant Marino.
In a quiet title action pursuant to Conn. Gen. Stat. § 47-31, it is the role of the court to make a full determination of the rights of the parties in the land. Lake GardaImprovement Assn. v. Bosttistone, 155 Conn. 287, 293 (1967). The scope and breadth of the provisions created by Conn. Gen. Stat. § 47-31 is broad enough to warrant a reevaluation of the 1956 decision in order to make a full determination of the rights of the parties in the land. See Lake Garda ImprovementAssn. v. Bosttistone, supra.
It is clear that the underpinnings of the 1956 decision do not exist today. The decision was predicated on the existence of a valid subdivision and an intent by Mr. Beit to embark on and complete that subdivision. Based on these two predicates, Judge Parmelee applied the rule set forth inWhitton v. Clark, 112 Conn. 28, 32 (1930) (hereinafter referred to at "Whitton Rule"). However, without these two predicates the Whitton Rule is inapplicable. The changes in fact have rendered the Whitton Rule inapplicable. In Whitton,
the court stated that:
 Where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had by them, and then sells the lots, referring in his conveyance to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands.
A predicate to applying this rule is that the owner "sells the lots." The rule is inapplicable where the owner has not sold the lots. The court used the word "sells the lots" and not the words "sells the land" or "sells a portion of the property or land," or "sells a reserved area," etc. The 1949 subdivision map has 74 clearly defined "lots," none of which have been or can be sold. A lot has a clearly defined meaning. Since no lots have been sold, the Whitton rule is CT Page 13601 not applicable. Since the 1956 decision is based on an application of an inapplicable rule, the judgment is not controlling. The change in facts since 1956 clearly demonstrates the inapplicability of the Whitton rule.
In the Whitton case, and its progeny, the developer had sold actually numbered lots and the developers had actually developed the subdivision. This is not the situation in the case at bar. See Whitton, supra (numbered lots were sold and subdivision was developed); Lucy v. Oram, 114 Conn. 642 (1932) (numbered lots were sold and subdivision was developed); LakeGarda Company v. D'Arube, 135 Conn. 949 (1949) (numbered lots were sold and subdivision was developed); Gerald ParkImprovements Assn. v. Bini, 138 Conn. 232 (1951) (numbered lots were sold and subdivision was developed); Stankiewicz v.Miami Beach Assn., 191 Conn. 165 (1983) (numbered lots were sold and subdivision was developed); Everett v. Rabitunia,11 Conn. App. 171 (1987) (numbered lots were sold and subdivision was developed).
Defendant cannot claim rights as a result of the 1949 subdivision map which is referenced in his deed. Changes in the law and facts invalidate the subdivision. To the extent that defendant's deed makes reference to so-called invalid Beit Street or the invalid subdivision map, it must be construed only for reference purposes. These references merely demarcate the property boundary, they do not give defendant any rights of access across plaintiff's property.
Defendant Does Not Have a Right-of-Way by Deed.
 1. The deeds in plaintiff's chain of title do not contain an explicit grant of a right-of-way.
Although not raised in the pleadings, the defendant argues that a right-of-way exists by the language of his deed. The deed in plaintiff's chain of title, beginning with the deed from Max and Ethel Beit in 1958 to John and Joseph Sudol, state that it is "[s]ubject to such rights-of-way as may exist over the southerly end of Beit Street in favor of abutting land owners. However, this general language is not sufficient to create a right-of-way. Conn. Gen. Stat. § 47-33d provides in relevant part, that marketable record title is subject to "[a]ll interest and defects which are created by or arise out of the muniment of which the chain of record title is formed; CT Page 13602 provided a general reference in the muniments, or any of them, to easements . . . are not sufficient to preserve them, unless specific identification is made therein of a recorded title transaction which creates the easement. . . ." Since there is no specific identification to a right-of-way, the reference in the deed should be given no effect. While this language may have been used to protect the warranty of title, it does not meet the requirements of Conn. Gen. Stat. § 47-33d.
Furthermore, notification in deeds to rights-of-way or easements frequently are described with the language "together with a right-of-way." The deeds in plaintiff's chain of title do not contain such language.
 2. Deeds in defendant's chain of title do not contain an explicit grant of a right-of-way.
The references in defendant's deed to the 1949 subdivision map and to Beit Street can be construed only as references to property boundaries.
Defendant raised the issue at trial that land may have been filled in on plaintiff's property over former riparian areas. The evidence clearly demonstrates that this was done at least 40 or more years ago, and that plaintiff had nothing to do with it. Mr. Gerwick testified that the State of Connecticut Department of Environmental Protection (hereinafter DEP) can issue a permit to allow a landowner to build on such land. One of the criteria that DEP examines is whether the applicant for the permit is an "innocent landowner." Plaintiff clearly will qualify as such. If plaintiff or a successor in title seeks to build on this property, it must file an application with the DEP. This issue, however, is irrelevant to the issue of quieting titleas between plaintiff and defendant.
The issue of whether Waterford should have required that plaintiff go through the resubdivision process is irrelevant to this quiet title action. If defendant wanted to raise this issue, he should have done so when the Planning and Zoning Commission was evaluating plaintiff's application for site plan approval, and then, if he was not pleased with the decision of the commission, he could have appealed to the Zoning Board of Appeals, and then to the Superior Court. Thus, this issue is not properly raised in this forum.[3]
CT Page 13603
The narrowed issues appear to the court to come to these points.
The plaintiff, a small bank, in the first instance, was a lender and granted an open end mortgage to Lyman for $300,000.00. The bank is in the business of making loans, it did not intend to own the property. The bank is now the owner due to the default of the mortgagor and the subsequent foreclosure. The bank manifestly was not a party to any proceedings between Max Beit and Marino, et ux. The only usable portion of the land now owned by the bank is a small area consisting of about .6 of an acre.
The defendant claims, among his numerous claims, that because his property is bounded by Beit Street, so called, a paper street, that this allows and permits defendant to use that area defined as Beit Street (see Plaintiff's Exhibit 4 as it borders his property.
Beit Street, as defined on Plaintiff's Exhibit 4, is fifty feet wide and begins at Reed Avenue. To sustain the defendant's claim then to use Beit Street would effectively destroy and prevent and preclude any use of the plaintiff's property and the ability to build thereon inasmuch as the total frontage of the plaintiff's property as shown on Plaintiff's Exhibit 5 an A-2 survey map is 53.99 feet.
None of the sand spit can be used or developed in that State and Federal environmental regulations prevent the same.
Clearly Judge Parmelee could never have envisioned preventing any possible use of the subject land.
The court having visited the premises is at a loss to understand how the Town could ever have considered such a development, even in 1949, of 74 lots on a sand spit with an elevation at its highest of no more than several feet above sea level. Mother Nature, however, has taught a lesson to all in the ravages of storms which have now cut a breech through the spit so that a major portion is now an island.
The sand spit is relatively narrow. The waters of Jordan Cove have broken through the spit about 300 feet out from where the spit begins. The spit then extends out in the shape CT Page 13604 of a letter Y. There are clearly the remains of bulkheading and pilings on the Long Island Sound side of the spit.
The land on the spit is in a wild state, beach grass, goldenrod, roses rogosa, etc. There is evidence of ancient fill, rocks, concrete pieces and macadam. Unfortunately, some junk debris was noted, iron bed springs, old metal, tie rods.
As to the deposition testimony of Mr. Marino, the court has some concerns. Mindful of Mr. Marino's age, 89, portions of his testimony seem clear and direct yet on several occasions he stated that in effect he never went to court as concerns the injunction.
Of necessity, there had to be a hearing before injunctive relief could be granted. Ms. Guiliano as noted was her uncle's conservatrix of his estate but not his person.
As already noted, the defendant's Special Defenses were:
1. lack of standing — now moot.
2. res judicata.
3. collateral estoppel.
To subscribe to the defendant's claims and position would leave the former mortgage bank, now the owner with a small parcel of property for all intents and purposes worthless.
The defendant at one point made a claim of prescriptive right due to use of the area defined as Beit Street but saw fit to withdraw that claim and it is not before the court. Clearly the injunction was never recorded and to sustain the defendant's position would leave the bank with a worthless price of property which the defendant or the neighbors could use as a parking lot.
Having carefully examined the premises, the court also finds that access to the defendant's garage which does front on Beit Street, but is set back therefrom, can be had with no difficulty whatsoever over the defendant's land.
Judgment may enter in favor of the plaintiff Jewett City Trust Company. CT Page 13605
The defendant has not sustained his burden of establishing rights in and to the paper street Beit Street on the basis of res judicata or collateral estoppel or by any fair preponderance of the facts at issue.
The defendant on the basis of the pleadings and the evidence has no rights in Beit Street except for the fact that it is one of the boundaries of his property.
Judgment is entered in favor of the Jewett City Trust Company on Marino's counterclaim.
Austin